**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWARD HAROLD SCHAD,
　　　　　　*Petitioner-Appellant,*

　　　　　　v.

CHARLES L. RYAN,* Arizona
Department of Corrections,
　　　　　　*Respondent-Appellee.*

No. 07-99005

D.C. No.
CV-9702577-PHX-
ROS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
May 14, 2009—San Francisco, California

Filed September 11, 2009
Amended January 12, 2010
Second Amendment June 3, 2010

Before: Mary M. Schroeder, Stephen Reinhardt and
Pamela Ann Rymer, Circuit Judges.

Order;
Dissent to Order by Judge Callahan;
Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge Rymer

---

*Charles L. Ryan is substituted for his predecessor Dora B. Schriro as
Director of the Arizona Department of Corrections. See Fed. R. App. P.
43(c)(2).

**COUNSEL**

Kelley J. Henry, Nashville, Tennessee, for the petitioner-appellant.

Jon G. Anderson, Phoenix, Arizona, for the respondent-appellee.

**ORDER**

The amended opinion filed January 12, 2010 is hereby amended. The amended opinion is filed concurrently with this order.

Judges Schroeder and Reinhardt have voted to deny the petition for panel rehearing and petition for rehearing en banc. Judge Rymer has voted to grant the petition for panel rehearing and petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are denied.

Absent further order of the court, no further petitions for rehearing or rehearing en banc will be considered.

Judge CALLAHAN, with whom KOZINSKI, Chief Judge, and O'SCANNLAIN, KLEINFELD, GOULD, TALLMAN, BEA, IKUTA Circuit Judges, join, dissenting from the denial of rehearing en banc:

Judge Rymer's dissent persuasively explains why the majority decision to remand for "further proceedings" and an evidentiary hearing on "diligence" and the merits of Schad's ineffective assistance of counsel claim conflicts with AEDPA's diligence requirement, 28 U.S.C. § 2254(e)(2), and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 420 (2000). *See* Amended Slip Op. at 7901-16 (Rymer, J., concurring in part, dissenting in part). I write separately to point out the gravity of the majority's departure from settled Supreme Court law, and to emphasize how it effectively eviscerates AEDPA's diligence requirement as well as the preliminary showing the Supreme Court has held a state prisoner must make in order to obtain an evidentiary hearing in federal court.

## I.

The majority opinion substantially erodes AEDPA's requirement that a person challenging the constitutionality of his state conviction diligently pursue his claim in state court in order to obtain an evidentiary hearing in federal court. 28 U.S.C. § 2254(e)(2). Not only does the majority's decision contravene the Supreme Court's decision in *Williams* by permitting an evidentiary hearing in the absence of an initial showing of diligence by the petitioner, it effectively eviscerates the diligence requirement altogether by endorsing a simultaneous hearing on both the petitioner's "diligence" and the merits of his claim of ineffective assistance of counsel ("IAC"). In approving of a single hearing on both issues, the court allows a petitioner to present new evidence on the merits of his underlying claim in a full-blown evidentiary hearing without first establishing that he was diligent in developing such evidence in state court. Moreover, the majority's deci-

sion effectively eliminates the requirement that a petitioner present a colorable claim for federal habeas relief before a federal court may grant an evidentiary hearing. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The potential for mischief created by the majority's approach is evident here, where it urges an evidentiary hearing on the merits of Schad's IAC claim without ever considering the "double deference" owed under *Strickland v. Washington*, 466 U.S. 668 (1984) and AEDPA. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (explaining that a federal court's evaluation of "a *Strickland* claim" under § 2254(d)(1) must be deferential to both the state court's decision and counsel's strategic choices). We should have reheard this case en banc to rectify these departures from Supreme Court precedent and to correct what district courts in our circuit are likely to perceive as a confusing directive to hold evidentiary hearings where Congress and the Supreme Court have determined that none are permitted.

## A.

After more than thirty years of litigation, this case has not come to rest. Schad was convicted of first-degree murder in 1979, and was sentenced to death in 1985 following a retrial. The majority's order remanding for "further proceedings" and a possible evidentiary hearing ensures that the litigation will continue for several more years despite every indication that it should end.

AEDPA provides that a district court "*shall not*" hold an evidentiary hearing if the petitioner has not been diligent in developing the factual basis for his claim in state court. 28 U.S.C. § 2254(e)(2) (emphasis added). "Diligence . . . depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." *Williams*, 529 U.S. at 435. As the Supreme Court explained in *Williams*, AEDPA's insistence that a petitioner diligently attempt to

develop evidence supporting his claims in state court is grounded in principles of comity:

> Comity . . . dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief. For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner *must be diligent in developing the record* and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. *Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.*

*Id.* at 437 (citations and internal quotation marks omitted) (emphasis added).

Disregarding the Supreme Court's admonition that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts" the petitioner failed to develop in state court, the majority remands this case to the district court so that Schad may have an opportunity to do just that. The majority attempts to justify its remand by concluding that (1) the record is insufficient to determine whether Schad was diligent in developing the evidence he seeks to present in federal court, and (2) the district court erred by not focusing on the "reasonableness" of Schad's efforts to do so. Neither conclusion withstands scrutiny.

The majority's first misstep is its failure to recognize that Schad has the burden of establishing his diligence in state

court. Ignoring glaring evidence of Schad's lack of diligence, the majority concludes that the record in this case is "insufficient" for it to determine whether or not his efforts in state court were "reasonable." Amended Op. at 7893. However, were the record in this case truly "insufficient" to determine Schad's diligence, that would definitively end the inquiry of whether or not he is entitled to an evidentiary hearing. The Supreme Court made clear in *Williams* that the petitioner has the burden of establishing that he was diligent in developing the evidence in the state court. 529 U.S. at 440. Thus, where a petitioner presents a record that does not sufficiently demonstrate diligence, he necessarily fails to meet his burden and is not entitled to an evidentiary hearing. Despite the clarity of the Supreme Court's guidance on this issue, the majority reaches a contrary conclusion, effectively holding that a petitioner's failure to demonstrate diligence in the first instance entitles him to "further proceedings" and a possible evidentiary hearing in order to try once more to make the necessary showing. This clearly contravenes *Williams*, eliminating the threshold showing of diligence the Supreme Court has held a petitioner must make in order to obtain an evidentiary hearing in federal court.

The majority's second mistake is its assertion that the district court misapplied *Williams* by focusing on Schad's "lack of success" in developing the evidence rather than the reasonableness of his efforts. Amended Op. at 7893. This is a mischaracterization of the record and the standard set forth in *Williams*.

The district court's published decision reveals that it did consider Schad's efforts to develop evidence in state court and found them to be less than diligent. *Schad v. Schriro*, 454 F. Supp. 2d 897, 955-56 (D. Ariz. 2006). Specifically, the district court observed that Schad was granted thirty-four extensions of time to file an amended petition with supporting evidence but that he failed to do so. Further, the district court rejected Schad's contention that a denial of funds was to

blame for his failure, noting that he could point to no funding request that the state court had denied. *Id*. at 955. The district court also rejected Schad's assertion that the state court wrongly denied him an opportunity to develop his claims in an evidentiary hearing, noting that the state court's refusal to hold an "evidentiary hearing was attributable to Schad's failure to develop a factual record that would have warranted a hearing." *Id.* at 955-56.

The record clearly shows that the district court considered and rejected Schad's contention that he was diligent in his efforts to develop evidence in state court. Furthermore, the record is not reasonably subject to dispute with regard to Schad's diligence. Schad had nearly four years in state court to uncover the evidence he now brings to federal court; he requested, and was granted, thirty-four extensions of time; and, he was provided with funds, an investigator, and a mitigation expert. Despite this wealth of time and resources, he failed to marshal any evidence regarding his own family background, and he further admitted in district court that the evidence was "*readily available*." *Id.* at 943, 955 (emphasis added).

The clarity of this record should foreclose a remand for "further proceedings" and a possible evidentiary hearing on the issue of Schad's diligence. Indeed, the majority does not explain what further facts remain to be developed regarding the "reasonableness" of Schad's efforts that the district court has not already heard.

However, it is not just my disagreement with the majority's decision to remand that prompts my dissent. Rather, I dissent from the denial of rehearing en banc because a remand for "further proceedings" and evidentiary hearing on *this* record renders the standard set forth in *Williams* meaningless.

The majority's critical error lies in its failure to recognize that where a petitioner admits that the evidence was "readily

available" in state court and the record shows that he failed to "bring it out," the "reasonableness" of his efforts is not subject to debate. Although the Supreme Court has held that an evidentiary hearing may be permitted where a petitioner, despite his diligence, was unable to develop evidence in state court, it has *never* authorized "further proceedings" and an evidentiary hearing where the petitioner fails to make an initial showing of diligence and admits that the evidence could have been developed in state post-conviction proceedings. *See Williams*, 529 U.S. at 433-35, 437. Rather, in such circumstances, the Court has held that AEDPA *prohibits* an evidentiary hearing. *See id.* (emphasis added). The majority's opinion turns this holding on its head.

Moreover, the majority's attempt to distinguish between the "reasonableness" of Schad's efforts and his "lack of success" in bringing out evidence is illusory. It conveniently ignores the reality that Schad's "lack of success" in bringing forth evidence is directly attributable to his abysmal efforts in developing it.

Thus, although the majority purports to rely on *Williams*, in reality, its decision is an impermissible reinterpretation of *Williams* that creates a wide, new avenue around AEDPA's diligence bar. In other words, by holding that a prisoner need not make an initial showing of diligence in state court to obtain a hearing in federal court, and by holding that a prisoner's efforts might be deemed "reasonable" and subject to closer examination in an evidentiary hearing even where he admits that the evidence he seeks to present was available in state court, the majority effectively re-writes *Williams* and eliminates AEDPA's diligence requirement.

The practical consequences of this holding are substantial. The majority opinion creates a precedent for future habeas petitioners demanding further proceedings and evidentiary hearings on whether they were diligent in developing evidence in state court. Moreover, if on this record an appeals

court can find the evidence of diligence to be insufficient, "further proceedings" and "hearings" will almost always be necessary before a district court can deny an evidentiary hearing for lack of diligence in state court. Such a result is clearly contrary to the plain meaning of § 2254(e)(2), as well as the Court's interpretation of that provision in *Williams*, and the majority's revision of the law is likely to engender confusion among the district courts as well as disparate outcomes in their rulings on state prisoners' requests for evidentiary hearings.

B.

The majority opinion does further violence to AEDPA's diligence requirement by commingling the diligence issue with Schad's underlying IAC claim, and endorsing a simultaneous hearing on both.

First, although the majority has made minor amendments to its opinion, it continues to hold that an evidentiary hearing on the issue of diligence is appropriate. I reiterate that this contradicts the Supreme Court's holding in *Williams* that "diligence" is the very thing a petitioner must establish to get a hearing in the first instance. *See Williams*, 529 U.S. at 433-34, 437.

Second, by concluding that a petitioner may present evidence on the merits of his IAC claim at a "diligence hearing," the majority eviscerates the diligence requirement altogether. Under the majority's approach, a petitioner may present new evidence on the merits of his underlying claim in the same hearing at which he attempts to establish his diligence. This novel procedure relieves the petitioner of his initial burden of establishing diligence in state court, and allows him to proceed immediately to a full-blown evidentiary hearing on the merits of his underlying claim. This contravenes *Williams*, ignores the principles of comity underlying that decision, and sets a precedent for the granting of evidentiary hearings in our

circuit where Congress and the Supreme Court have determined none are permitted.

## C.

Not only does the majority's approach contravene *Williams*, it also is in direct conflict with other Supreme Court authority governing a habeas petitioner's ability to obtain an evidentiary hearing in federal court.

In *Landrigan*, the Court held that when determining whether to grant a prisoner's request for an evidentiary hearing, "a federal court must consider whether such a hearing could enable" the prisoner "to prove . . . factual allegations, which, if true, would entitle [him] to federal habeas relief." 550 U.S. at 474. The Court explained that whether a prisoner presents a colorable claim for relief is a question governed by AEDPA, and therefore, federal courts must take into account AEDPA's deferential standards in deciding whether an evidentiary hearing is appropriate. *Id.* (citations omitted).

The majority's opinion ignores this requirement, as it remands for further proceedings and an evidentiary hearing on the merits of Schad's IAC claim simply "because the evidence Schad presented to the district court was *stronger than* the evidence presented at sentencing."[1] Amended Op. at 7894 (emphasis added).

As Judge Rymer explains in her dissent, the majority does not once consider whether Schad has presented a colorable

---

[1] It will be a rare case in which a prisoner claiming ineffective assistance of counsel cannot offer "stronger evidence" of deficient performance in post-conviction proceedings than was available at sentencing. Indeed, we have repeatedly declined to address *Strickland* claims in direct appeals precisely because such a claim may be better presented following development of facts outside the original record. *See, e.g.*, *United States v. Daychild*, 357 F.3d 1082, 1095 (9th Cir. 2004) (citing *United States v. Houtchens*, 926 F.2d 824, 828 (9th Cir. 1991)).

claim of ineffective assistance of counsel under the highly deferential standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), nor does it consider whether the state court decision denying that claim was objectively unreasonable or contrary to clearly established Supreme Court precedent under AEDPA. 28 U.S.C. § 2254(d); *Landrigan*, 550 U.S. at 478. The majority's determination that an evidentiary hearing is nonetheless appropriate ignores the Supreme Court's instruction for federal courts to consider "the deferential standards prescribed by § 2254" in determining whether a petitioner has made the necessary showing to obtain an evidentiary hearing. *Landrigan*, 550 U.S. at 474. Moreover, it runs counter to the Supreme Court's directive to accord "double deference" to state court decisions adjudicating IAC claims. *Mirzayance*, 129 S. Ct. at 1420.

The majority's endorsement of an evidentiary hearing on the merits of Schad's IAC claim without any consideration of whether he presents a colorable claim under *Strickland* or AEDPA represents a troubling departure from settled law.[2]

---

[2]It is, however, not the first time we have failed properly to apply the standards established by AEDPA. *See, e.g.*, *McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (per curiam) (reversing for failure to apply AEDPA properly); *Mirzayance*, 129 S. Ct. at 1420 (reversing our application of AEDPA and *Strickland*); Waddington v. Sarausad, 129 S. Ct. 823, 831-35 (2009) (reversing for failure to apply AEDPA properly); *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (same); *Schriro v. Landrigan*, 550 U.S. 465 (2007) (reversing our application of AEDPA and *Strickland*); *Carey v. Musladin*, 549 U.S. 70, 73 (2006) (reversing for failure to apply AEDPA properly); *Rice v. Collins*, 546 U.S. 333 (2006) (same); *Kane v. Garcia Espitia*, 546 U.S. 9 (2005) (per curiam) (same); *Brown v. Payton*, 544 U.S. 133, 136 (2005) (same); *Yarborough v. Alvarado*, 541 U.S. 652, 655 (2004); *Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (same); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) (reversing our application of AEDPA and *Strickland*); *Lockyer v. Andrade*, 538 U.S. 63, 66 (2003) (reversing for failure to apply AEDPA properly); *Woodford v. Visciotti*, 537 U.S. 19, 20 (2002) (per curiam) (reversing our application of AEDPA to state court decision denying petitioner's claim under *Strickland*); *Early v. Packer*, 537 U.S. 3, 4 (2002) (per curiam) (reversing for failure to apply AEDPA properly).

Moreover, its failure to pay heed to the governing Supreme Court decisions paves the way for unwarranted evidentiary hearings on even meritless claims.

## II.

In sum, the majority's seemingly innocuous decision to remand for "further proceedings," including a possible evidentiary hearing concerning both the issue of Schad's diligence and the merits of his IAC claim is, in reality, a substantial revision of § 2254(e)(2) and governing Supreme Court authority.

It effectively eviscerates AEDPA's diligence requirement by (1) eliminating the threshold showing of diligence required to obtain an evidentiary hearing, (2) permitting an evidentiary hearing on the issue of diligence itself, and (3) endorsing simultaneous hearings on both the issue of "diligence" and the merits of a petitioner's underlying claim.

By endorsing evidentiary hearings on the issue of "diligence," even when the record clearly shows that the evidence was readily available in state court, the majority's holding directly contradicts *Williams*. Furthermore, and perhaps most troubling, the majority's endorsement of a simultaneous evidentiary hearing on both "diligence" and the merits of a prisoner's underlying claim is made without any reference to AEDPA or to governing Supreme Court law requiring the prisoner to present a colorable claim for federal habeas relief before he is granted a hearing in federal court. Instead, the majority's precedential decision permits a petitioner to argue that his failure to marshal readily available evidence was "reasonable," and that, therefore, he is entitled to an evidentiary hearing not only on the issue of diligence (in contravention of *Williams*) but also on the merits of his IAC claim without any regard for the standards established by AEDPA or *Strickland.*

This represents a breathtaking departure from settled Supreme Court precedent and effectively eliminates all of the

benchmarks set by AEDPA and the Court for a prisoner to obtain an evidentiary hearing in federal court. For these reasons, I respectfully dissent from the decision not to rehear this case en banc.

## OPINION

PER CURIAM:

## I.  Overview

Edward Harold Schad was convicted in Arizona state court in 1979 of the murder of Lorimer Grove, and sentenced to death. After his first conviction and sentence were reversed by the Arizona Supreme Court on collateral review, Schad was re-tried in 1985, and was again convicted of first-degree murder and sentenced to death. His direct appeal and state habeas proceedings from his second trial lasted for the next twelve years, and his federal habeas proceedings in district court for nine years after that. After the district court denied Schad's federal habeas petition on all grounds, he filed this appeal in 2007.

Schad's appeal raises seven principal contentions. Three pertain to his conviction and four to the imposition of the death sentence. The challenges to the conviction include a claim of a *Brady* violation in the state's failure to disclose impeachment material relating to the credibility of a prosecution witness; a claim of ineffective assistance during the guilt phase of trial; and a challenge to the sufficiency of the evidence in support of first-degree murder.

Schad's four challenges to the sentence include claims of ineffective assistance during the penalty phase, application of an unconstitutionally narrow standard for determining the admissibility of mitigating evidence, improper use of a prior

conviction to establish two aggravating factors, and insufficiency of the evidence underlying a third aggravating factor.

With respect to the conviction, the important issue involves the state's admitted failure to produce letters written in 1979 by a detective and a prosecutor to assist the state's witness, Duncan, in an unrelated California prosecution. With respect to the sentence, the key issue is whether the district court erred by denying the claim of ineffective assistance of counsel at the penalty phase without holding an evidentiary hearing to consider substantial additional mitigating evidence. The district court ruled Schad failed to exercise diligence in bringing the new evidence out during his state habeas proceedings, but it did so without appropriate consideration of the many reasons Schad offered for his inability to produce the mitigating evidence during the state proceedings.

We affirm the district court's denial of habeas relief for the conviction. With respect to sentencing, we conclude that the district court applied the wrong diligence standard to deny Schad an evidentiary hearing on his sentencing ineffectiveness claim. We vacate the district court's denial of habeas relief and remand for the court, using the correct diligence standard, to determine whether an evidentiary hearing is warranted on Schad's claim of ineffective assistance at the penalty phase of his trial for failure to present material mitigating evidence.

## II. Facts and Procedural Background

This is a case with strong circumstantial evidence pointing to the defendant's guilt and to no one else's. The victim, Lorimer Grove, a 74-year-old resident of Bisbee, Arizona, was last seen on August 1, 1978, when he left Bisbee driving his new Cadillac, coupled to a trailer, to visit his sister in Everett, Washington. Grove may have been carrying up to $30,000 in cash.

On August 9, 1978, Grove's body was discovered in thick underbrush down a steep embankment off the shoulder of U.S. Highway 89, several miles south of Prescott, Arizona. The medical examiner determined that the cause of death was ligature strangulation accomplished by means of a sash-like cord, still knotted around the victim's neck. According to the medical examiner, Grove had been strangled using a significant amount of force, resulting in breaking of the hyoid bone in his neck and the reduction of his neck circumference by approximately four inches. The time of death was estimated to be four to seven days prior to discovery of the body.

No physical evidence at the crime scene implicated Schad in Grove's murder, and there was no evidence of a prior connection between the two men. There was, however, ample evidence establishing Schad's presence in Arizona at the time of the crime and his possession, after the date Grove was last seen, of Grove's property, including his Cadillac, credit cards and jewelry.

On August 3, 1978, two days after Grove left Bisbee, and six days before his body was discovered, an Arizona highway patrolman found an abandoned Ford Fairmont sedan alongside Highway 89, approximately 135 miles north of where Grove's body was discovered. The Ford was unlocked, except for the trunk, and its license plates were missing. A check of the Fairmont's VIN revealed that Schad had rented the car from a Ford dealership in Utah in December 1977, had failed to return it, and that the dealership had reported it as stolen.

According to Schad's girlfriend, Wilma Ehrhardt, she and Schad, along with Ehrhardt's children, had driven the car from Utah to New York, Florida, and Ohio between December 1977 and July 1978. In late July, Schad told Ehrhardt he was going to look for work and left Ohio with the Ford. Ehrhardt and the children remained in Ohio, but later returned to Utah.

When police impounded the Ford on August 3, 1978, they found in it, among other things, three Arizona newspapers dated July 31 and August 1, 1978, the days just before the estimated date of Grove's murder, as well as a special mirror device later identified by witnesses as an object Grove invented to help him couple his trailer to his Cadillac.

According to credit card records, on August 2, 1978, Schad began driving the Cadillac from Arizona eastward, using Grove's credit cards to make purchases in numerous cities along the way. On August 2, Schad used Grove's credit card to purchase gasoline in Benson, Arizona. On August 3, Schad used the card to purchase gas in Albuquerque, New Mexico. For approximately the next month, Schad continued traveling the country in the Cadillac and using Grove's credit card. Schad also used Grove's checkbook to forge a check to himself from Grove's account, which he cashed on August 7, 1978, in Des Moines, Iowa.

In New York state on September 3, 1978, Schad, still driving Grove's Cadillac, was stopped for speeding by a New York state highway trooper. Schad told the trooper he was delivering the car to New York on behalf of a "rather elderly" man named Larry Grove. Schad could not produce the car's registration, and instead gave the trooper the registration for Grove's trailer. The trooper issued Schad a citation and let him go.

Schad then drove back across the country, reuniting with Ehrhardt in Salt Lake City, Utah, on September 7, 1978. A man who was living with Ehrhardt at the time, John Duncan, contacted Salt Lake City police the same day to report that Schad had told him the Cadillac was stolen. Schad was arrested in Salt Lake City on September 8.

After Schad's arrest, Salt Lake City police impounded and searched the Cadillac. From the Cadillac's title application, found in the car, the police learned that the vehicle belonged

to Grove. Schad told police that he had obtained the Cadillac four weeks before in Norfolk, Virginia, after meeting "an elderly gentleman who was with a young girl" and who asked Schad to trade vehicles temporarily so that he and the girl would not be recognized. Schad also told the Utah police that he "was supposed to leave [the Cadillac] at the New York City port of entry at a later date for the man to pick up." Police found in the Cadillac's trunk a set of Utah license plates issued to Ehrhardt. Schad had previously installed these plates on the stolen Ford. He left the Cadillac's original plates on the car while he was driving it across the country.

After Schad's arrest, Ehrhardt went to the Salt Lake City jail and retrieved Schad's wallet. Duncan then searched the wallet and found the credit card receipts and the New York traffic citation. He again contacted the Salt Lake City police. When Detective Halterman came to Ehrhardt's home to collect the wallet and the documents, Ehrhardt also handed over a diamond ring she said her daughter had found in the glove compartment of the Cadillac. Witnesses later identified the ring as belonging to Grove. Duncan also visited Schad in jail. Duncan testified that during the visit Schad talked about lying about his presence in Arizona at the time of the crime and destroying evidence of the crime.

On October 5, 1979, the jury found Schad guilty of first-degree murder, and the court sentenced Schad to death. The Arizona Supreme Court affirmed the conviction and death sentence. *State v. Schad*, 633 P.2d 366, 383 (Ariz. 1981). The United States Supreme Court denied Schad's petition for certiorari. *Schad v. Arizona*, 455 U.S. 983 (1982). Schad then petitioned for habeas relief in the state courts and obtained a reversal of his conviction on the ground that the trial court improperly instructed the jury on the elements of felony murder. *State v. Schad*, 691 P.2d 710, 711-12 (Ariz. 1984).

In Schad's 1985 retrial, he was again convicted of first-degree murder on materially the same evidence, and sen-

tenced to death. The Arizona Supreme Court again affirmed on direct appeal. *State v. Schad*, 788 P.2d 1162, 1174 (Ariz. 1989). The United States Supreme Court granted certiorari to resolve two questions: (1) whether a first-degree murder conviction is unconstitutional when it does not require the jury to agree on whether the murder was premeditated murder or felony murder; and (2) whether capital defendants are entitled to jury instructions on all lesser included offenses. *Schad v. Arizona*, 501 U.S. 624 (1991). The Court answered both questions in the negative and affirmed the conviction and sentence. *Id.*

Schad again sought collateral review in state court. The trial court denied the state habeas petition after four years in which Schad's counsel sought repeated extensions to file his supplemental petition detailing his claims, particularly with respect to mitigating sentencing evidence. The Arizona Supreme Court denied review.

Schad filed his federal habeas petition in the District of Arizona in August 1998, raising nearly thirty claims. In a published opinion dated September 28, 2006, the district court denied habeas relief. *Schad v. Schriro*, 454 F. Supp. 2d 897 (D. Ariz. 2006). With respect to the challenges to the conviction, the court ruled that the state's failure to disclose impeachment material had not resulted in prejudice, that counsel was not ineffective at the guilt phase, and that the evidence was sufficient to support the conviction. With respect to sentencing, the court denied Schad's request for an evidentiary hearing to present new mitigating evidence in support of his claim of ineffective assistance at the penalty phase, finding that Schad was not entitled to a hearing because he was not diligent in developing the evidence in question during state habeas proceedings. *Id.* at 955-56. The district court also said that the evidence presented in district court did not render trial counsel's performance deficient because the evidence did not support the strategy of presenting the positive image that

trial counsel had pursued at trial. *Id.* at 941-44. This appeal followed.

## III.   The Three Challenges to the Conviction

### A.   State's failure to disclose exculpatory material

**[1]** John Duncan, a principal witness for the state, had a lengthy criminal history. As part of its efforts to gain his cooperation in the first trial, in 1979, the prosecution promised to assist Duncan with a pending, unrelated California criminal proceeding. In impeaching Duncan's credibility, the defense was able to question him at length about his criminal record and the prosecution's promises of assistance, but the defense did not know that a prosecutor and detective in 1979 had actually written letters on Duncan's behalf to California authorities. Schad's most significant challenge to his conviction is the prosecution's failure to disclose these letters as impeachment material. Schad asserts that the state's actions violated his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959).

The state has conceded that it should have disclosed the letters under *Brady*, so the *Brady* issue is whether Schad was prejudiced by the omission. We agree with the district court that the omission does not justify habeas relief because it resulted in little or no prejudice, given the extensive impeachment material already available to the defense.

Duncan eventually testified in both trials that while Schad was being detained prior to trial in 1979, Duncan visited him to talk about the theft of the Cadillac, and Schad made several incriminating statements: he asked Duncan to destroy Grove's credit cards, and said that he "would deny being in any area of Arizona or the state of Arizona, particularly Tempe, Arizona and Prescott, Arizona."

In order to obtain Duncan's testimony and assistance with the Schad investigation, an investigative officer, Detective Halterman, had told Duncan he would write a letter to the judge presiding over Duncan's pending California criminal case. Moreover, the day before Duncan was set to testify at Schad's first trial in 1979, the prosecutor at that trial wrote to the California Community Release Board, stating that Duncan was "an extremely important witness for the State of Arizona" who had been "very cooperative" and "deserve[d] any consideration that can be given, including an early release, if possible." The prosecutor wrote a similar letter a few weeks later to the California judge presiding over Duncan's prosecution, stating that Duncan was "an important witness who was of material assistance to the prosecution" in Schad's case, and requesting that Duncan's "sentence be reviewed and if possible, his sentence be modified in light of his contribution to criminal justice."

Before the second trial in 1985, defense counsel unsuccessfully moved to suppress Duncan's testimony. Duncan testified at that trial that Detective Halterman promised to write a letter on his behalf, but stated he did not know whether Halterman actually sent one. Halterman testified that he did offer to write a letter on Duncan's behalf, but stated he did not remember whether he actually sent a letter. Duncan further testified that he did not ask the prosecutor in Schad's first trial for any special treatment, although he did tell the prosecutor he knew of "people in the state prison that have been released early due to the fact of a state prisoner being a witness in a major or semi major crime." Duncan stated that he did not receive early release or any other lenient treatment in exchange for his testimony at Schad's first trial. At the close of the second trial, the prosecution still had not disclosed the letters so the defense could use them to impeach Duncan.

The defense was, however, able to impeach Duncan's credibility with other evidence of his lengthy criminal history, including the fact that he was currently serving a sentence for

theft. Duncan admitted the advantages he asked for and some he obtained in exchange for his involvement in the Schad investigation. Detective Halterman stated on cross that although he could not remember whether he sent a letter to California authorities on Duncan's behalf, he recalled promising to do so, and "probably" did send a letter, further impeaching Duncan's credibility. Through this impeachment, the defense established Duncan had a motivation to testify falsely. The letters themselves would have provided some documentation of his motivation, but would not have provided a new or further motivation.

It is not now disputed that the letters could have been used to impeach Duncan. The prosecution's duty to disclose material, potentially exculpatory evidence — including impeachment evidence — to a criminal defendant was established in *Brady*, 373 U.S. at 86. The state violates its obligations under *Brady*, and denies a criminal defendant due process of law, where the following three elements are met: (1) the evidence in question was favorable to the defendant, meaning that it had either exculpatory or impeachment value; (2) the state "willfully or inadvertently" suppressed the evidence; and (3) the defendant was prejudiced by the suppression. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The sole dispute here concerns the question of prejudice. The state's failure to disclose the letters written on Duncan's behalf was prejudicial to Schad if "there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation omitted).

**[2]** We conclude the state's admitted failure to turn over the letters was not prejudicial. In the first place, the letters provided no independent basis for impeaching Duncan. We are less likely to find the withholding of impeachment material prejudicial in cases in which the undisclosed materials would

not have provided the defense with a new and different form of impeachment. In *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005), for example, we held that the prosecution's failure to disclose evidence of a witness's four prior convictions was not prejudicial because the undisclosed evidence was duplicative of impeachment already pursued at trial. We explained that the evidence would not have "provide[d] 'the defense with a new and different ground of impeachment.' " *Id.* at 1097 (quoting *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005)).

We have also applied that test to grant relief where the undisclosed evidence would have provided a new basis for impeachment. In *Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005), we held that the prosecution's failure to disclose an immunity deal with its key witness did prejudice the defendant, where the impeachment pursued at trial went to the witness's criminal history and participation as a getaway driver in the defendant's offense. The undisclosed *Brady* information was that the key witness had received immunity for his testimony; this provided an independent motive for the witness to lie and would have made his critical, uncontroverted testimony less credible. *Id.* at 580. We held that the undisclosed promise of immunity was material, and therefore prejudicial, because it constituted "a wholly different kind of impeachment evidence" from the lines of impeachment pursued by the defense at trial. *Id.*

**[3]** This case is like *Barker*, where the undisclosed evidence related to the same motives to lie as evidence already known to and utilized by the defense. Here the jury knew that the prospect of obtaining assistance with the California case provided an incentive to lie. Moreover, Duncan was also impeached by his extensive criminal record, apart from the California case.

In addition, in this case each of the three letters was written in connection with Duncan's assistance at Schad's first trial

in 1979, so that the letters would have shed little light on Duncan's motivation to testify at the second trial six years later. Duncan had already enjoyed any benefit the letters prompted, and did not receive any further assistance for his testimony in 1985.

**[4]** Finally, and most important, the circumstantial evidence demonstrating Schad's guilt was powerful, and Schad did not offer any significant evidence to rebut the strong inference of guilt arising from that evidence. In light of the evidence against Schad, any additional impeachment value of the letters would not have changed the jury's verdict.

**[5]** Schad is not entitled to relief on his *Brady* claim because of the lack of prejudice resulting from the prosecution's failure to produce the actual letters written pursuant to a promise of assistance to Duncan that, along with the history of Duncan's other transgressions, was fully known to the defense.

In a related argument, Schad asserts that the state committed prosecutorial misconduct by permitting Duncan to testify falsely in 1985 that he did not receive any assistance from the state in exchange for his cooperation. Schad relies on *Napue*, 360 U.S. at 269, in which the Supreme Court held that the state violated a defendant's right to due process by doing nothing to correct a witness's false testimony that he received no promise of consideration from the prosecutor in exchange for his cooperation.

To prevail on a *Napue* claim, a habeas petitioner must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). Under *Napue*, false testimony is material, and therefore prejudicial, if there is "any reasonable likelihood that the false testimony could have affected the judgment of

the jury." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citation omitted); *see also id.* at 978 ("[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.") (internal quotation marks and citation omitted).

**[6]** In this case, it is not entirely clear that Duncan lied. Although there is some indication in the record that Duncan may at some point have learned that Detective Halterman wrote a letter on his behalf, because the letter was referred to during a California proceeding in Duncan's case, it is not clear that Duncan remembered this letter in 1985 and thus lied on the stand. Even assuming he did, there is no evidence that the state knew or should have known that his testimony was false. Finally, the record before us does not reflect that the California authorities acted on Halterman's and the prosecutor's requests to benefit Duncan. Duncan's testimony that he received no assistance in his California case was not necessarily false even if he knew and remembered the letter.

### B.   Ineffective assistance of counsel at the guilt phase

Schad argues that his trial counsel's failure to locate and present impeachment testimony from Duncan's ex-wife, Sharon Sprayberry, amounted to ineffective assistance of counsel. Schad contends Sprayberry's testimony would have impeached Duncan's statements about his jailhouse conversation with Schad in which, according to Duncan, Schad made statements about the need to destroy incriminating evidence and stated he would deny being in the area of Arizona where the murder took place. In an affidavit submitted with Schad's state habeas petition, Sprayberry attested that she was present during the conversation and that Schad "did not make any statements relating to a homicide in Arizona."

Ineffective assistance of counsel claims require a defendant to show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness," and that

there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

**[7]** Regardless of whether Sprayberry may have provided evidence helpful to Schad's case, Schad does not attempt to establish counsel's performance was deficient. In his briefing on appeal, Schad concedes that defense counsel's efforts to locate Sprayberry were "diligent and thorough." *Strickland* requires both deficient performance and prejudice to make out an ineffective assistance of counsel claim. *See id.* at 687. Schad's inability to show his counsel's efforts to obtain the evidence were deficient is fatal to his claim.

## C.   Sufficiency of the evidence

Schad's final conviction-related claim challenges the sufficiency of the evidence underlying his conviction for first-degree murder. In reviewing a sufficiency of the evidence challenge, we ask whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (original emphasis). Because the state habeas court did not address the merits of this claim, we review de novo whether sufficient evidence exists to support Schad's murder conviction. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

**[8]** Circumstantial evidence and reasonable inferences drawn from it may properly form the basis of a conviction. *United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995). The circumstances of Grove's death, including the fact that the murder was accomplished by ligature strangulation, permitted the jury to infer that the killing was intentional and premeditated, as required under Arizona law. *See* Ariz. Rev. Stat. § 13-1105(A). Thus, the main issue at trial was the iden-

tity of Grove's killer. To establish that Schad murdered Grove, the state introduced evidence that one day after Grove was last seen alive, Schad was in possession of Grove's property, including his vehicle, credit cards, and checkbook. Schad's description to New York authorities of Grove as an elderly man strengthened the inference that Schad had encountered Grove in person. Moreover, the state introduced evidence that would permit a rational jury to infer that Schad knew about Grove's death, including Schad's statement to Duncan that he would deny being near the scene of the crime, and request to Duncan to destroy Grove's credit cards. The evidence, taken as a whole, was sufficient to allow a rational jury to return a conviction for first-degree murder, and we therefore deny relief on this claim.

## IV. Sentencing Claims

### A. Introduction — The 1985 Sentencing Proceeding

Prior to the sentencing hearing before the trial court in 1985, Schad's counsel filed a 39-page sentencing memorandum that presented the following mitigating circumstances, which focused largely on his prison conduct following his original conviction in 1979: (1) Schad was a model prisoner; (2) Schad pursued higher education while in prison; (3) Schad had numerous stable friendships; (4) the trial court gave a felony-murder instruction at Schad's trial, meaning that Schad's conduct may have been less reprehensible than a premeditated murder; (5) Schad had a troubled childhood with abusive parents; (6) Schad was beaten and threatened while in prison in Utah for a prior conviction; (7) Schad showed potential for rehabilitation; (8) Schad had a stable character; (9) Schad did not pose a risk of violent or dangerous behavior; (10) Schad made charitable contributions; (11) Schad did not drink or use drugs; and (12) Schad had an excellent employment record in Arizona prisons.

At the sentencing hearing, Shaw called fifteen witnesses, including correctional officers, friends, relatives and a psychi-

atrist. Nearly all of the testimony related to Schad's good rep-
utation and behavior as an adult, and particularly his good
behavior while in prison. A Utah prison official, John Powers,
testified regarding Schad's personal development and conduct
while he was incarcerated in Utah state prison after a prior
offense. Powers stated that Schad "made some great strides"
in the prison's group therapy program. He also testified that
Schad was permitted to be near weapons while working on a
renovation project because he "was an excellent security
risk." Powers testified that, in general, Schad was a "model
prisoner" while incarcerated in Utah, and that he recom-
mended Schad's release because he felt Schad was not a dan-
ger to the community. One Arizona prison official, Frank
Terry, testified that Schad was placed in a relatively low-
security prison block because he posed no disciplinary prob-
lems or security risks, and another official, Jerry McKeand,
elaborated that Schad actually assisted with other prisoners'
disciplinary issues by helping to "keep[ ] the cell block kind
of in line."

Next, several of Schad's friends and relatives testified.
Janet Bramwell, a friend and fellow member of Schad's
church, the King of Glory Lutheran Church in Tempe, testi-
fied that Schad requested and received instruction in the
Lutheran faith while in prison, and was confirmed as a mem-
ber of the church. Bramwell also testified that she, her hus-
band, and other church members wrote letters to Schad,
welcoming him into the congregation and telling him about
themselves and their families. Bramwell stated that after she
and her husband received a letter in return, they began visiting
Schad in prison approximately once per month. Bramwell
described Schad as "clean and well-groomed," "likeable," and
a "very intelligent person, very talented," and stated that
Schad opened up to her and her husband about his difficult
childhood. Bramwell's husband, Frank Bramwell, confirmed
her testimony and also described Schad's educational efforts
while incarcerated, including earning such good grades in his
college courses that he was named to the dean's list. Another

friend and fellow church member, Herb Zerbst, testified regarding his friendship with Schad. Zerbst and his wife corresponded with Schad using both written letters and audio cassettes on which they recorded messages. Zerbst and his wife also visited Schad in prison until they moved to Illinois. Zerbst described Schad as friendly and caring, and described Schad's concern for the Zerbsts' safety during their long drive to Illinois. Zerbst also stated that Schad was creative and sent him and his wife gifts, including crocheted items and paintings.

Ronald Koplitz, the chaplain at Schad's prison, stated that Schad consulted him for religious guidance due to his fear of death. He testified that Schad stood out from other prisoners because he was likeable and genuine. Koplitz described Schad as "the kind of inmate you can like, and the kind of inmate that does not play games or try to . . . . get extra favors by being in a religious program." He testified that despite Schad's troubled childhood, he believed Schad had a "stable personality," at least in a controlled prison setting.

The psychiatrist, Otto Bendheim, testified briefly regarding Schad's early background and mental condition. Bendheim stated that Schad "had a miserable childhood and ha[d] been delinquent since his teens" and that he "was a deprived youngster," but that despite his criminal history, Schad was "not a dangerous type," was "pleasant" and had "above average" intelligence, and Bendheim was not "a bit afraid for his own safety" when he met with Schad.

The pre-sentence report prepared by a probation officer included discussions of Schad's troubled childhood, favorable character reports from several of Schad's friends and Arizona prison officials, and Schad's good behavior and achievements in prison. The report described Schad's childhood as follows:

> The defendant reported a very stormy childhood, with his father being an alcoholic and abusing the

defendant on a regular basis. The defendant stated that his father would beat him with his fist as discipline. The defendant reported that he tried to protect the family from his father's abuse by allowing his father to inflict beatings on him for anger towards other members of the family. The defendant always kept his problems to himself and to this day has not dealt with the feelings he has regarding his life.

The defendant learned at an early age how to suppress his feelings, even to the point of refusing to display emotion when his father would abuse him. . . . The defendant stated that at age seventeen he tried to commit his father to the VA Hospital for treatment. He stated that his father was out of control due to his alcoholism. When the officials came to pick up his father, the defendant's mother changed her mind and took sides with her husband. The defendant stated that when the officials left he experienced the worst beating of his life. The defendant described his decision to commit his father as the hardest thing he ever did in his life.

The defendant stated that in addition to the abuse his father would never allow him to socialize with others; consequently, the defendant was a very shy, withdrawn adolescent.

At the sentencing hearing, defense counsel praised the presentence report's discussion, but did not present additional evidence regarding Schad's troubled childhood. Counsel did not, for example, present testimony or affidavits from Schad's relatives to provide first-hand descriptions of the abuse Schad suffered as a child, nor did counsel seek a comprehensive psychiatric evaluation to assess the negative effects of that abuse.

After the sentencing hearing, the court rendered a special verdict discussing the aggravating and mitigating factors.

First, the court took into account Schad's positive record since his arrest and incarceration. The court found that the most persuasive mitigating circumstance was the fact that Schad was "a model prisoner, a student and a religious man with many supportive friends since being incarcerated." The court observed that Schad was "helpful, charitable and appears to care for people," that he did not abuse drugs or alcohol or have any discipline problems, and that he took many college courses while in prison and earned good grades. The court said, however, that although Schad's "good, stable character" and "signs of rehabilitation" constituted a mitigating factor, this factor was "not particularly weighty of view of [Schad's] length of incarceration."

Next, the court noted Schad's "unfortunate childhood," but concluded it was not a "persuasive mitigating circumstance." The sentencing court determined that the mitigating circumstances presented by Shaw were insufficient "to overcome any one of the aggravating circumstances," and imposed a sentence of death. After conducting an independent review of the aggravating and mitigating evidence, the Arizona Supreme Court affirmed, concluding that the mitigating factors were "insufficient to outweigh a single aggravating factor." *Schad*, 788 P.2d at 1174.

The aggravating factors applied by the sentencing court related to a prior conviction and to the circumstances of the murder. The court relied on a 1968 Utah second-degree murder conviction to impose aggravating factors for having a prior conviction punishable under Arizona law by a life sentence or by death, and for having a prior conviction of a crime of violence. The court also found that Grove's murder was committed for the purpose of pecuniary gain. On appeal, the Arizona Supreme Court affirmed the first and third of these aggravating factors, and declined to reach the issue of whether the violent crime aggravator was sufficient to support imposition of the death penalty. *Id.* at 1170.

**B.    The Protracted State Court Post-Conviction Proceedings**

After Schad was sentenced to death, he initiated state post-conviction proceedings in 1991 in which he was represented by a new attorney. In Schad's preliminary state habeas petition, filed on December 16, 1991, he argued the sentencing court failed to give proper weight to mitigating evidence of his troubled family background, but he did not raise a claim of ineffective assistance of counsel. The state court ordered Schad to file a supplemental petition by February 18, 1992, and Schad's legal team requested and obtained seventeen successive extensions of that deadline. During that time, post-conviction counsel obtained appointment of an investigator to look into Schad's family history.

In January 1994, Schad was appointed a new post-conviction attorney. The court granted her request for further investigative services, as well as more than ten motions for an extension of the deadline to file Schad's supplemental state habeas petition. In March 1995, counsel obtained appointment of a mitigation expert. The court denied counsel's request for disclosure of Schad's prison file and for contact visits to allow the mitigation expert to interview Schad.

After the court ruled that no additional extensions of time would be granted, counsel filed Schad's supplemental petition on October 19, 1995. The supplemental petition included a general claim that Schad's sentencing counsel was ineffective for failing to discover and present mitigating evidence regarding Schad's family background. Attached to the supplemental petition was an affidavit from the expert in which she stated that the presentence report used at Schad's sentencing hearing did not adequately address the extent of the abuse Schad had suffered as a child. The affidavit described the physical and psychological abuse inflicted by Schad's father, including beating Schad with a belt or fists, refusing to allow Schad's mother to show him any affection, and isolating Schad from

other children. The expert recommended that a comprehensive psychological evaluation be performed, and stated that she could compile a thorough profile only through further interviews with Schad and his relatives.

The state habeas court denied the ineffective assistance claim in June 1996 without holding an evidentiary hearing. The court described Schad's request for a hearing as amounting to nothing more than a "fishing expedition." Schad filed a motion for rehearing along with another expert affidavit. That affidavit indicated that she had performed additional interviews with Schad and obtained more information about his life history, but did not describe the new information or include any supporting affidavits or other documents. The trial court denied the motion for rehearing, and in 1997 the Arizona Supreme Court denied Schad's petition for review.

## C.   Federal Habeas Proceedings

By the start of federal habeas proceedings in 1998, Schad's counsel had obtained a great deal more information about his early and abusive childhood experiences. Schad asserted that he received ineffective assistance of counsel at the penalty phase of trial when his attorney, Shaw, failed to investigate and present mitigating evidence regarding Schad's troubled childhood, and instead relied on the brief discussion of Schad's childhood contained in the psychiatrist's testimony and in the presentence report. During proceedings before the district court, Schad sought an evidentiary hearing in order to present a significant amount of evidence regarding his abusive childhood, which he contends his sentencing counsel should have presented at the sentencing hearing.

The district court held that Schad was not entitled to an evidentiary hearing because he was not diligent in attempting to develop the evidence during his state habeas proceedings. The court denied Schad's ineffective assistance claim without holding an evidentiary hearing. For the following reasons, we

conclude that the district court applied the wrong standard in ruling on the issue of Schad's diligence, and remand for the court to determine, using the correct standard, whether an evidentiary hearing is warranted on the merits of the ineffective assistance claim.

Schad sought to present mitigating evidence not submitted during sentencing or during his state post-conviction proceedings, including extensive mental health records of his mother, father, and brother, as well as several declarations discussing Schad's childhood and its effect on his mental health. The first declaration, from psychologist Charles Sanislow, provided an extremely detailed discussion of the psychological impact of Schad's abusive childhood. The second declaration, from psychologist Leslie Lebowitz, discussed the mental health history of Schad's parents, including his mother's struggle with prescription drug addiction and his father's affliction with post-traumatic stress disorder due to spending eighteen months in a German POW camp during World War II. Declarations from Schad's mother and aunt provided details regarding Schad's father's severe alcoholism and the abuse he inflicted upon his family. The final declaration, from a paralegal employed by the office of the Federal Public Defender, described interviews with Schad's sister and aunt regarding Schad's childhood.

The district court held, however, that Schad was not entitled to expansion of the record or to an evidentiary hearing because he was not diligent in developing the proffered evidence in state court. The district court also held that even if the evidence were considered in federal court, the evidence did not show that sentencing counsel was deficient in failing to present it. The court ruled the strategy counsel pursued was competent and that the newly proffered evidence could not have affected the result.

### D.  Schad's Claims

### 1.  Diligence

[9] The fundamental issue presented in this habeas proceeding is whether Schad was diligent in seeking to present in state collateral proceedings the extensive mitigating evidence offered in district court. Under 28 U.S.C. § 2254, the district court shall not hold an evidentiary hearing to consider new evidence if the petitioner has "failed to develop" the factual basis of the claim in state court, unless the claim relies on an intervening change in constitutional law or a factual predicate that could not previously have been discovered, and the evidence the petitioner seeks to present would establish by clear and convincing evidence the petitioner's entitlement to habeas relief. 28 U.S.C. § 2254(e)(2). A petitioner has "failed" to develop a claim where there was a lack of diligence or some other fault on the part of the petitioner or his counsel. *Williams v. Taylor*, 529 U.S. 420, 432 (2000). In this context, diligence requires a habeas petitioner to have made a "reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 436. If a petitioner fails to discover the facts necessary to support his claim despite making a reasonable effort to investigate those facts, he will not be barred from introducing new evidence in federal court. *Id.* at 435 ("Diligence . . . does not depend . . . upon whether [investigative] efforts could have been successful.").

The record before us reflects that Schad's legal team attempted in state court to develop a factual basis for his ineffective assistance claim, but faced several difficult obstacles. Schad's family members were not cooperative and counsel had difficulty accessing records generated during a decade of prior proceedings in Schad's case. This resulted in three changes in counsel. The mitigation expert was not appointed until 1995, and although her affidavits after her appointment explained that she needed additional time for investigation

due to the vast size of Schad's records and the reticence of Schad's family members, the state habeas court set the deadline for filing the supplemental state habeas petition at a date three months after her appointment. As a result, Schad was unsuccessful in bringing out any significant mitigation evidence during his state habeas proceedings, leading to the denial of his ineffective assistance of sentencing counsel claim without an evidentiary hearing in state court.

**[10]** The district court, however, focused not on the reasonableness of Schad's efforts in state court to develop mitigating evidence regarding his childhood, but on the fact that he did not succeed in doing so. The court emphasized that Schad failed to present the evidence to the state post-conviction court despite having several years to do so as well as having a court-appointed investigator. The court held: "[T]he record demonstrates that the state court facilitated Petitioner's investigation and development of evidence supporting his claims." *Schad*, 454 F. Supp. 2d at 955. The district court further stated, "The state court's refusal to hold an evidentiary hearing was attributable to Petitioner's failure to develop the factual record." *Id.* at 955-56. The district court thus did not fully consider the materials presented to it because it ruled that Schad had not been diligent in attempting to develop the basis of his claim during his state post-conviction proceedings. The district court's focus on Schad's failure to develop a record in state court, rather than on whether he was delinquent in attempting to do so, was not in accord with controlling Supreme Court precedent. *See Williams*, 529 U.S. at 435 ("Diligence for purposes of [28 U.S.C. § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful.").

**[11]** In the district court, Schad presented evidence that, we conclude, if it had been presented to the sentencing court, would have demonstrated at least some likelihood of altering

the sentencing court's evaluation of the aggravating and mitigating factors present in the case. The evidence showed how Schad's childhood abuse affected his mental condition as an adult. Had the sentencing court seen this evidence, which was so much more powerful than the cursory discussion of Schad's childhood contained in Bendheim's testimony and the presentence report, it might well have been influenced to impose a more lenient sentence. There was ample evidence presented at sentencing to illustrate Schad's intelligence, good character, many stable friendships, and church involvement, at least while he was in prison. Although Schad had a prior Utah conviction for second-degree murder, that charge arose out of an accidental death. The missing link was what in his past could have prompted him to commit this aberrant violent act of intentionally killing Grove. Without this psychological link, the crime appeared to be nothing but the act of a ruthless and cold blooded killer in the course of a robbery, and Schad was therefore sentenced to death. The extensive evidence of repressed childhood violent experiences could have supplied that link and mitigated his culpability for the crime.

The record is clear that Schad did not succeed in bringing out relevant mitigating evidence during state habeas proceedings. Because the district court focused on this lack of success, it did not determine the reasonableness of Schad's efforts to develop a record in state court. Neither the state court nor the district court record, however, contains information sufficient for us to determine whether or not those efforts were reasonable and whether Schad therefore acted diligently.

[12] We therefore remand for further proceedings to determine whether Schad was diligent in attempting to develop the state court record. The court should apply the proper standard as to the reasonableness of his efforts. In ordering a remand, we recognize the district court stated it had considered the new evidence proffered by Schad in support of his ineffective assistance of sentencing counsel claim and said that, even assuming diligence, this new evidence could not justify relief.

We disagree with that ruling. Thus, should the district court, upon its further inquiry, find that Schad's efforts to develop the record in state court were reasonable, the district court should hold an evidentiary hearing on the merits of his ineffective assistance of sentencing counsel claim, because the evidence Schad presented to the district court was stronger than the evidence presented at sentencing. Alternatively, in the event the district court determines an evidentiary hearing on diligence is appropriate, the district court could hold a single evidentiary hearing at which it receives evidence concerning both diligence and the merits. If it reaches the merits, the district court should take into account the Supreme Court's recent decisions in *Porter v. McCollum*, 558 U.S. __, 130 S. Ct. 447 (2009), and *Wong v. Belmontes*, 558 U.S. __, 130 S. Ct. 383 (2009).

## 2.  State courts' consideration of mitigating evidence

Schad not only seeks to rely on mitigating evidence not presented at trial, but also challenges the standard under which the state courts evaluated the mitigating evidence that was submitted. While he makes a strong argument that the state court was following the wrong standard in other cases, we cannot conclude that the state court actually applied a standard that was too narrow in this case.

Because the state habeas court denied this claim without addressing the merits, we review de novo whether the state courts violated Schad's constitutional rights by failing to consider and give effect to the mitigating evidence of Schad's childhood. *Pirtle*, 313 F.3d at 1167.

We begin with the Supreme Court's decisions in *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982). In *Lockett*, a plurality of the Court struck down an Ohio statute requiring mandatory imposition of the death penalty unless certain specified mitigating circumstances applied. 438 U.S. at 607-08. The Court held that a

state's statutory scheme for capital sentencing must not preclude the sentencing court from considering any mitigating evidence offered by the defendant. *Id.* at 604.

**[13]** In *Eddings*, the Court extended *Lockett*, holding that an Oklahoma capital sentencer acted unconstitutionally by refusing to consider evidence of the defendant's abusive childhood. The court ruled that the state court constitutionally erred in holding that only evidence which specifically negated an offense element was relevant for mitigation purposes. 455 U.S. at 108-13. The Court explained that *Lockett*'s holding applies not only to state statutes that prevent a capital sentencing authority from considering all potentially mitigating circumstances, but also to the process by which a sentencing court conducts the sentencing proceedings: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 113-14 (original emphasis).

Schad's principal contention in this case is that the state courts did not consider the evidence of his troubled childhood because they unconstitutionally required a "nexus" between his childhood abuse and his commission of Grove's murder. Schad contends the state courts applied the same test the Supreme Court rejected in *Tennard v. Dretke*, 542 U.S. 274, 281 (2004).

In *Tennard*, a case involving a defendant's low mental acuity, the Court invalidated a Fifth Circuit test that rendered potential mitigating evidence of a mental condition relevant to a capital sentencing determination only if the defendant presented evidence that "the criminal act was attributable to" the mental condition. In *Smith v. Texas*, 543 U.S. 37, 45 (2004), the Court went further and rejected any "nexus test," explaining that the requirement to prove a "nexus" between mitigating evidence and the charged offense is "a test we never countenanced and now have unequivocally rejected." *Tennard*

and *Smith* are retroactively applicable to the Arizona Supreme Court's 1989 decision in this case. *Smith*, 543 U.S. at 45; *see also Graham v. Collins*, 506 U.S. 461, 467 (1993).

Before *Tennard* was decided, Arizona courts recognized a nexus test, similar to that rejected in *Tennard*, to preclude consideration of evidence of childhood abuse unless the abuse bore a causal connection to the crime of conviction. *See, e.g.*, *State v. Djerf*, 959 P.2d 1274, 1289 (Ariz. 1998) In *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989), decided eight months before the Arizona Supreme Court's decision in this case, the Arizona Supreme Court said that "a difficult family background, in and of itself, is not a mitigating circumstance." *Id.* at 986.

After *Tennard*, however, the Arizona Supreme Court has clarified that the nexus test affects only the weight of mitigating evidence, not its admissibility. *See State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006) ("We do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence. But the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence.") (citing *Tennard*, 542 U.S. at 287). The United States Supreme Court has said that the use of the nexus test in this manner is not unconstitutional because state courts are free to assess the weight to be given to particular mitigating evidence. *Eddings*, 455 U.S. at 114-15.

In two recent published opinions, we granted habeas relief from Arizona murder convictions on the ground that a lower court used an unconstitutional nexus test. *Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008); *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007). In *Styers*, we granted relief to a habeas petitioner whose evidence of post-traumatic stress disorder was expressly disregarded by the Arizona courts due to his failure to demonstrate a causal connection between the disorder and the crime. The Arizona Supreme Court had con-

cluded that although evidence of post-traumatic stress disorder "could . . . , in an appropriate case, constitute mitigation," it did not constitute mitigation in the instant case because "two doctors who examined defendant could not connect defendant's condition to his behavior at the time of the conspiracy and the murder." *Id.* at 1035 (quoting *State v. Styers*, 865 P.2d 765, 777 (Ariz. 1993)). We held that the court's imposition of a nexus requirement was contrary to the clearly established rule set forth in *Eddings*. *Id.*

In *Lambright*, we granted habeas relief after concluding that the district court improperly applied a preclusive nexus test and declined to consider mitigating evidence of the petitioner's post-traumatic stress disorder. We stated that the district court's approach was "fundamentally flawed" and that the court "misapplied" *Tennard* and *Eddings*. 490 F.3d at 1114-15. We explained that the court erred by refusing to consider the majority of Lambright's mitigating evidence solely on the ground that he failed to show a nexus between the mitigating evidence and the crime. *Id.*

[14] In both of those cases, however, it was clear from the record that the lower court had applied the unconstitutional nexus test and had excluded mitigation evidence. By contrast, in this case, there is no indication that the state courts applied a nexus test, either as a method of assessing the weight of the mitigating evidence, or as an unconstitutional screening mechanism to prevent consideration of any evidence. Rather, the record shows that the sentencing court did consider and weigh the value of the small amount of childhood mitigation evidence that was offered, stating that it was not "a persuasive mitigating circumstance in this case." The Arizona Supreme Court stated that it had conducted an independent review of the entire record regarding the aggravating and mitigating factors. *See Schad*, 788 P.2d at 1172. In short, it does not appear that the state courts refused to consider any evidence Schad offered. They concluded, as *Eddings* allows them to do, that it did not outweigh the aggravating circumstances.

**[15]** Absent a clear indication in the record that the state court applied the wrong standard, we cannot assume the courts violated *Eddings*'s constitutional mandates. *See Bell v. Cone*, 543 U.S. 447, 455 (2005) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."). We must hold there was no constitutional error in the Arizona courts' consideration of the mitigating evidence of Schad's troubled childhood.

**[16]** Schad's two remaining contentions with respect to the state courts' consideration of the mitigating evidence are easily disposed of. First, Schad challenges the state courts' weighing of the aggravating and mitigating evidence. It is well-established, however, that state courts have the discretion to assess the appropriate weight of sentencing-related evidence. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."). It was well within the state courts' discretion to determine that the mitigating evidence presented in Schad's case did not outweigh the aggravating evidence.

**[17]** Next, Schad challenges the state courts' failure specifically to address each of the categories of mitigating evidence he presented at his sentencing hearing. State courts imposing or reviewing capital sentences are not required to provide an exhaustive discussion of all the mitigating evidence presented, as long as it is clear from the record that they reviewed the evidence. *See Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005) ("[T]he trial court need not exhaustively analyze each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.") (internal quotation marks and citation omitted). Moreover, where, as here, the sentencing court states that it has considered all the mitigating evidence offered, we may not second-

guess its actions. *See id.* ("This court may not engage in speculation as to whether the trial court actually considered all the mitigating evidence; we must rely on its statement that it did so.").

### 3. State courts' application of aggravating factors

Schad challenges the state courts' determinations regarding the aggravating circumstances present in his case. Most importantly, he challenges the sufficiency of the evidence underlying the pecuniary gain aggravating factor, the only aggravating factor connected to this crime. Schad contends that application of the aggravating factor was improper because there was insufficient evidence to prove robbery was a motive for Grove's murder.

Under Arizona law, "[a] court may find pecuniary gain as an aggravating factor if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder." *State v. Hyde*, 921 P.2d 655, 683 (Ariz. 1996). In applying the pecuniary gain factor, the sentencing court in this case emphasized that the state had proved that Schad was in possession of Grove's credit cards and his vehicle within a day of the murder and immediately began using the vehicle and the cards, as well as his check book. Grove's vehicle was a new Cadillac, while Schad abandoned his stolen Ford. In affirming the application of the factor, the Arizona Supreme Court held that these facts constituted "strong circumstantial evidence that the purpose of the murder was pecuniary gain." *Schad*, 788 P.2d at 1171. We review this determination under AEDPA standards that require us to give a presumption of correctness to a state court's factual determinations. 28 U.S.C. § 2254(e)(1).

In essence, Schad's position is that without direct evidence of his guilt, no rational sentencer could have made any finding as to his motive. Schad's guilt, however, was established at the guilt phase through circumstantial evidence. There is

nothing irrational about relying on circumstantial evidence to show motive. Nor was the application of the pecuniary motive factor arbitrary or capricious. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

**[18]** It is clear that the evidence presented at trial regarding Schad's acquisition and use of Grove's vehicle, credit cards and checkbook rationally supported the application of the pecuniary gain aggravating factor. After Grove's death, Schad was living off of Grove's credit cards and his bank account. Indeed, like the district court, we find it difficult to imagine a non-pecuniary motive for the murder. *See Schad*, 454 F. Supp. 2d at 931 ("[D]espite Petitioner's argument that the evidence could lead to contradictory inferences, it is difficult to ascribe a motivation other than pecuniary gain to the offense against Mr. Grove, who was a complete stranger to Petitioner."). Accordingly, we uphold the validity of pecuniary gain as an aggravating factor.

The state courts concluded that, under state law, a single aggravating factor was sufficient to support imposition of the death penalty in this case. Because we conclude that the pecuniary gain factor was rationally supported by the evidence presented, and not arbitrarily imposed, we do not reach the challenges to other aggravating factors.

## V. Conclusion

We affirm the district court's denial of habeas relief on all claims related to Schad's conviction. With respect to the sentence, we reverse the district court's conclusion that Schad was not entitled to an evidentiary hearing regarding his claim of ineffective assistance of counsel at sentencing. On remand, the court should determine whether there was a "failure" to develop the record in state court under the standard set forth in *Williams*. We remand for the district court to consider, using the proper standard, whether Schad was diligent in pur-

suing state court relief, and if so, to hold a hearing on the merits of his ineffectiveness claim.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

RYMER, Circuit Judge, concurring in part and dissenting in part:

While I concur in the rest of the opinion, I part company with the majority's decision to remand for an evidentiary hearing on diligence and, in turn, on the merits of Schad's claim of ineffective assistance of counsel at sentencing.[1]

First, I believe that the district court faithfully construed AEDPA's diligence requirement, properly applied 28 U.S.C. § 2254(e)(2), and correctly determined that during state post-conviction proceedings, Schad did not make "a reasonable attempt, in light of the information available at the time, to investigate and pursue" his claim of ineffective assistance of counsel. *Williams v. Taylor*, 529 U.S. 420, 435 (2000). Schad and his state habeas counsel knew from the presentence report that his childhood was abusive but that details about his family background were not proffered in mitigation at the penalty phase. This information was available at the time. He had nearly four years in state post-conviction proceedings to ferret out the affidavits and evidence presented for the first time in federal court. He was never denied a request for funding or help in state court. Instead of trying to try the issue in state court, Schad asked for thirty-four continuances and ended up

---

[1] I concur in Section III of the per curiam opinion with respect to Schad's challenges to his conviction, and with respect to sentencing, in Sections IV.D.2 (the state courts' consideration of mitigating evidence) and IV.D.3 (the state courts' application of aggravating factors). I dissent only from Section IV.D.1.

presenting no facts to that court in support of this claim. Now, with the majority's blessing, Schad is making the federal court sitting in habeas an alternative forum for trying facts and issues which he made insufficient effort to pursue in state proceedings. This is precisely what *Williams* says that federal courts should not become. *Id.* at 437.[2]

Second, I disagree with the majority's view that the district court improperly focused on the success of Schad's state-court efforts, or that the weight of newly developed information has any role in the diligence inquiry. The district court properly focused on the notice, information, time and resources available to Schad, as well as on the causes for delay. *See Schad v. Schriro*, 454 F.Supp.2d 897, 951-53, 955-956 (D. Ariz. 2006). I also disagree that this court should (or may) order an evidentiary hearing on diligence that Schad himself did not ask for, simply because the record seems to two of us to contain information that is inadequate to determine whether Schad's efforts in state court were reasonable. It was Schad's burden to show diligence, and if the record is insufficient to determine that Schad's efforts *were* reasonable, then it was sufficient to determine they were *not* reasonable. That is what the district court found, and rightly so.

---

[2]As the Court explained in *Williams*:

> Comity dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief. For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.

529 U.S. at 437 (internal quotes, alterations, and citations omitted).

Finally, in these circumstances § 2254(e)(2) bars an eviden-
tiary hearing on the merits of Schad's ineffective assistance
claim. Nevertheless the majority orders one if, on remand, the
court determines that Schad was actually diligent. It does so
without taking into account the district court's alternative
explanation why no hearing is required, without mentioning
AEDPA, and without tethering the order to *Strickland*.[3] And
I take issue with that.

As Schad did next to nothing in state court to develop the
factual predicate of his ineffective assistance of counsel
claim, he is barred from obtaining an evidentiary hearing on
the merits of that claim in federal court. I would, therefore,
affirm across the board.

I

Schad alleges that his counsel was ineffective at sentencing
for failing to investigate Schad's family background and to
present corroborating evidence about the nature and effects of
his abusive childhood.

In a nutshell, the record shows: Counsel's mitigation case
at sentencing emphasized Schad's changed character and
potential for rehabilitation. Fourteen people in the Phoenix
area who had come to know Schad while he was incarcerated
testified that they valued his friendship, good works, and posi-
tive contribution to their lives. Counsel also pointed out the
emotional harm caused by Schad's abusive childhood with an
alcoholic father. For this he relied on the presentence report.[4]

_____

[3]*Strickland v. Washington*, 466 U.S. 668 (1984).

[4]The presentence report indicated that Schad reported "a very stormy
childhood, with his father being an alcoholic and abusing the defendant on
a regular basis." Schad's father beat him with his fist and never allowed
him to socialize with others. Schad often accepted beatings to protect other
members of his family. Schad kept his problems to himself and had yet
to deal with the feelings regarding his life. At the age of seventeen, Schad

Sentence was imposed in 1985 and affirmed on direct appeal in 1989. After a trip to the United States Supreme Court, Schad filed a post-conviction petition in state court on December 16, 1991. John Williams took over as counsel after the petition was filed, and was ordered to file a supplemental petition by February 18, 1992. That deadline was extended five times (February 14, March 18, April 17, August 6, and October 14, 1992). On November 3, 1992 Williams was replaced by Michael Chezem. Chezem successfully sought appointment of an investigator and funds (July 30, 1993), and also obtained twelve extensions (January 5, 1993, February 2, April 14, May 14, June 28, July 30, August 19, September 27, October 25, November 29, December 27, 1993, and February 1, 1994). On January 31, 1994, Chezem withdrew and was succeeded by Rhonda Repp. She obtained authorization for further investigative services in February 1994; on March 28, 1995, she asked for the services of a mitigation expert, which the court approved on July 6, 1995. Meanwhile, she asked for and received a series of extensions on the ground that she and the investigator had not completed their investigation and located all potential witnesses (February 16, 1994, March 18, April 22, May 24, June 23, July 22, August 30, September 27, October 31, November 21, December 28, 1994, January 18, 1995, February 21, April 20, May 22, June 20, July 21, August 22, and September 20, 1995). On September 20, 1995 the court ruled that no further continuances would be granted. A supplemental post-conviction petition was filed on October 19, 1995, together with a request for an evidentiary hearing on the basis of "newly discovered evidence." The newly discov-

_____

tried to commit his father to the VA Hospital for treatment because his father was out of control due to alcoholism. However, his mother took his father's side and Schad was given the worst beating of his life. Schad left home at eighteen, once he graduated from high school. His father died when Schad was incarcerated on the Utah offense, and his last contact with his mother was in 1978 when she was drinking and he figured it was better not to stay around. Schad hadn't had contact from his siblings since the Arizona murder, but did write them.

ered evidence consisted of an affidavit by the mitigation expert, Holly Wake, expressing her opinion that the presentence report failed adequately to address the seriousness of Schad's abuse; it contained no new facts and identified no witnesses. The state court denied the ineffectiveness claim in July 1996 for lack of any specifics.

Schad's federal petition was filed December 16, 1997; an amended petition was filed August 3, 1998. The following year Schad presented newly developed information together with a request for an evidentiary hearing on the merits of his ineffectiveness claim.[5] The district court found that Schad knew the factual basis for his claims at the time of post-conviction proceedings, and had not shown that the newly developed information was not available during that period. The court rejected Schad's argument that post-conviction counsel were diligent because they asked for time, funds, and a hearing to investigate, develop, and present evidence. As the court explained, post-conviction counsel requested and were granted thirty-four extensions, delaying proceedings for four

---

[5]The newly developed information submitted in support of Schad's federal ineffective assistance claim includes an affidavit from his mother recounting her experiences with Schad's father; an affidavit from an investigator reciting a conversation with Schad's sister, which describes what it was like to grow up in a poor household with cold and distant parents who showed no affection for their children, and with his aunt, who discussed the religious upbringing of the Schads, Mr. Schad's war experiences, and the death of Schad's infant sister; employment records of Schad's mother (indicating that she was prescribed narcotics for injuries) and Veterans' Administration records of Schad's father (showing that he returned from the war with a disabling anxiety disorder and alcoholism); an affidavit by a clinical psychologist, Dr. Leslie Lebowitz, noting that Schad's family was dysfunctional and the violence and neglect the children experienced left them at a tremendous disadvantage when faced with challenges of adult life; and an affidavit by a clinical psychologist, Dr. Charles Sanislow, who prepared a social history of Schad repeating the family background, and could not rule out the possibility that Schad's history of abuse, neglect, and abandonment played a significant factor in his psychiatric and behavioral functioning as an adult.

years, and were provided with funds, an investigator, and a mitigation expert. Likewise, the district court found that reasonable counsel with the time and funding available to post-conviction counsel would have presented evidence in support of Schad's position that his family background was not adequately explored by trial counsel. Further, the court found, the state court did not unreasonably deny an evidentiary hearing given that only conclusory claims were made about additional mitigation evidence. Accordingly, because Schad did not " 'undertake[ ] his own diligent search for evidence' in state court," the court held that Schad was not entitled to an evidentiary hearing or to expand the record. *Schad*, 454 F.Supp.2d at 956 (quoting *Williams*, 529 U.S. at 435).

## II

New evidence may be introduced on federal habeas "only if respondent was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254 (e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (citing *Williams*, 529 U.S. at 431-37).[6] This rule applies to requests for evidentiary hearings, and whenever parties seek relief based on new evidence.

---

[6]28 U.S.C. § 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* The rule also covers a motion to expand the record under Habeas Rule 7.[7] *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005).[8]

Schad does not argue that the exceptions permitting a hearing or admission of new evidence under § 2254(e)(2)(A) or (B) apply. Thus the lone issue is whether he failed diligently to develop the factual basis for his claim in state court proceedings.

"Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. "Diligence for the purposes of the opening clause depends on whether the prisoner made a reasonable attempt, in light of the information available, to investigate and pursue claims in state court[.]" *Id.* at 435. "The failure to investigate or develop a claim given knowledge of the information upon which the claim is based, is not the exercise of diligence." *Cooper-Smith*, 397 F.3d at 1241 (citing *Williams*, 529 U.S. at 439-40). The petitioner bears the burden of showing diligence. *See Williams*, 529 U.S. at 440 (concluding that petitioner met the burden of showing he was diligent in efforts to develop the facts supporting certain claims).

The district court applied these principles, and did so correctly in my view. The presentence report disclosed that Schad's childhood was abusive and unstable, that he had siblings, that his father was an out-of-control alcoholic whom

---

[7]Habeas Rule 7 provides, in relevant part: "if the petition is not dismissed, the [habeas court] may direct the parties to expand the record by submitting additional materials relating to the petition."

[8]*Cooper-Smith* indicates that the standard of review is an open question, 397 F.3d at 1241 n.12, but regardless of whether it is *de novo* or for abuse of discretion, the district court properly denied Schad's request for an evidentiary hearing and to expand the record because he did not exercise diligence in his efforts to develop the factual basis of his claims in state court.

Schad had sought to have committed, that Schad was forced to endure beatings and isolation, and that neither parent stood up for him or gave him attention or affection. This put post-conviction counsel on notice that details of Schad's family background beyond those brought out at sentencing might be mitigating. Notice of the need to develop evidence is an important marker of diligence. In *Williams*, for example, the Court found that the petitioner was *not* diligent in developing facts in support of a *Brady* claim in part because the trial transcript put the petitioner's habeas counsel on notice of possible exculpatory evidence, but *was* diligent in developing juror bias and prosecutorial misconduct claims in part because nothing in the record "would have put a reasonable attorney on notice" of misconduct. 529 U.S. at 437-44. In line with *Williams*, I would conclude (as the district court did) that Schad knew the factual basis for his claims during post-conviction proceedings.

Further, the information newly developed for federal court was available during state court proceedings. Indeed, Schad told the district court that the newly discovered mitigating evidence was "readily" available at the time of sentencing, but wasn't presented due to defense counsel's lack of investigation — and that had counsel only looked, he would have found it.[9] It follows that the newly discovered information was readily available to post-conviction counsel as well, but wasn't adduced due to lack of investigation.

---

[9]Petitioner's Brief Pursuant to Court's May 8, 2000 Order and Motion for Evidentiary Hearing (filed October 23, 2000). After summarizing the newly developed information, Schad argues that he was prejudiced by sentencing counsel's failure to investigate and discover this evidence, stating: "First, readily available mitigating evidence was not presented due to defense counsel's lack of investigation." *Id.* at 88. Prefacing his summary of the newly discovered evidence, Schad says: "Had counsel only looked, however, he would have found this." *Id.* at 81.

I mention this not to suggest that the facts could have been discovered, but to indicate that the information sought was available at the time. *See Williams*, 529 U.S. at 435.

Schad had plenty of time (four years) and resources (all he asked for) to pursue the claim; he just wasn't persistent. His efforts consisted of one telephone call in 1993 by an investigator to Schad's mother and his request for an evidentiary hearing. In the phone call, Schad's mother said that Edward was a good boy, declined to say where his siblings were, and hung up. She was apparently reluctant or afraid to talk about her son over the phone with someone she didn't know,[10] which is perfectly understandable. However, there was no follow-up. Schad also asked for an evidentiary hearing in state court, which, if well-founded, might show diligence — but it doesn't here because he offered no facts and identified no witnesses in support. *Cf. Williams*, 529 U.S. at 437 (noting that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."). So far as the record reveals, that's it for effort.

There is no evidence that the state impeded those efforts. Schad's requests for professional assistance and funds were granted. All but the last extension he sought for filing a definitive petition in order to investigate, locate witnesses, and review the file were granted.[11]

The majority faults the district court in part because it ruled without "appropriate consideration of the many reasons Schad offered for his inability to produce the mitigating evidence during the state proceedings." Maj. op. at 7871. I disagree: The district court *did* consider the reasons advanced by Schad, but found them wanting — as do I. For instance: Schad

---

[10]*See* Petitioner's Reply to Respondents' Brief on the Merits (filed June 12, 2001), at 70 (discussing reasonableness of Mrs. Schad's reluctance to talk over the phone with someone assisting her son for the first time in fifteen years).

[11]So far as I can tell, the only requests that were denied were for a contact visit with Schad, though post-conviction counsel interviewed him twice; for certain prison records; and for more time after the thirty-fourth extension had expired.

argued that the state court did not allow time and a hearing to develop his claims; the district court rejected this excuse given that his counsel asked for, and received, thirty-four extensions, resulting in a delay of four years. 454 F.Supp.2d at 955. Schad also complained about the "chaos" occasioned by being represented by multiple attorneys; the district court rejected this excuse because one counsel alone had twenty-one months (and nineteen extensions) to complete the investigation and file a supplemental petition. *Id.* Schad posited that a denial of funds posed a roadblock; the district court rejected this excuse as Schad was unable to point to any funding request that the state court denied. *Id.* To the contrary, as the district court observed, the record demonstrates that the state court *facilitated* Schad's investigation and development of evidence by appointing an investigator (who was on the case for more than two years) and a mitigation specialist. Although the mitigation specialist was only appointed three months before the supplemental petition was filed, counsel had been on the case for over a year before she requested such an appointment and, as the district court found, even a year later when the specialist filed her supplemental affidavit (July 7, 1996), she was able to make only conclusory claims about the existence of additional, unspecified mitigation evidence. *Id.* And Schad maintained that the state court denied him an opportunity to develop his claims in an evidentiary hearing; the district court rejected this excuse because the state court's refusal to hold an evidentiary hearing was attributable to Schad's failure to develop a factual record that would have warranted a hearing.[12] *Id.* at 955-56.

---

[12]The district court found with respect to the submissions in support of an evidentiary hearing that "[a] reasonable attorney, provided with the time and funding to which post-conviction counsel had access, would have presented affidavits and records in support of the argument that Schad's traumatic family background was not adequately explored by trial counsel." 454 F.Supp.2d at 956. Schad offers no evidence to the contrary. It is manifest from the record that this is so. *See Holland*, 542 U.S. at 652 (stating that "attorney negligence . . . is chargeable to the client and precludes relief unless the conditions of § 2254(e)(2) are satisfied").

Rather than acknowledging what the district court actually considered and found, the majority identifies "several difficult obstacles" that *it* believes Schad faced in attempting to develop a factual basis for his ineffective assistance claim in state court that led to his being unsuccessful in bringing out any significant mitigation evidence during his state habeas proceedings. Maj. op. at 7891. These are that Schad's family members weren't cooperative; counsel had difficulty assessing records generated during a decade of prior proceedings; these difficulties somehow "resulted in" three changes in counsel; and the state post-conviction court set a deadline for filing the supplemental petition three months after appointment of the mitigation specialist. However, neither alone nor in combination do these "obstacles" indicate that Schad made a reasonable effort to develop a record in state court in light of available information to which he was timeously alerted.

So far as family cooperation is concerned: The only evidence in the record is that in 1993, Schad's mother unsurprisingly hung up on a phone call by an investigator she didn't know; that she wouldn't tell him where Schad's siblings were; and that even though Schad had written them, his siblings had not responded. So far as appears, no follow-up or attempts to engage other family members were made.[13]

So far as accessing records is concerned: Schad made no showing that he was thwarted in developing in state proceedings the newly developed information produced in federal court such as his mother's medical records, his father's VA records, and evidence that he had to pay his own way around the house and procure alcohol for his father. As the district court noted, the rest of what the mitigation expert later gleaned from Schad's mother, sister, and aunt, is similar to information in the presentence report. Beyond this, Schad

---

[13]In her 1999 affidavit filed in federal court, Schad's mother avers that she "would have done anything to help Ed," including going from New York to Arizona to tell the judge all the things she says in her affidavit.

failed to link whatever difficulty he may have experienced in getting records from the Arizona prison and those from out of state to his ability to present the claim at issue here — ineffectiveness of sentencing counsel in failing to pursue family background — and none appears. The same applies to records from his first trial.

So far as multiple counsel is concerned: No basis appears for supposing that difficulties in developing a record led to multiple counsel, or vice-versa. In any event, all else aside, Schad's last post-conviction counsel had ample time (more than fifteen months to file the supplemental petition and twenty months before state proceedings were concluded), enough continuances (nineteen), and the assistance of an investigator and mitigation specialist, to develop the claim.

So far as the state court's final deadline is concerned: The district court explained why it was neither unreasonable nor material. Schad had been given more than thirty extensions and four years to get his act together. He failed to seek appointment of a mitigation expert for more than three and a half years. Even so, a year later the mitigation specialist was still unable to offer anything concrete.

For these reasons, I would hold that Schad did not meet the burden of showing that he was diligent in efforts to develop the factual basis for his ineffective assistance of counsel claim in state court.

III

The majority's analysis does not persuade me otherwise. The per curiam concludes that the district court applied an incorrect diligence standard — focusing, in its view, on the lack of success rather than the reasonableness of Schad's efforts to develop a record in state court — and remands for an evidentiary hearing under the "proper" standard to determine whether Schad was diligent. Maj. op. at 7893. I do not

agree that the district court failed to measure up, or that an evidentiary hearing is needed or appropriate.

In *Williams*, the Commonwealth of Virginia argued that the only question for purposes of the introductory clause of § 2254(e)(2) — the clause that states "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings" — is whether the factual basis was indeed developed in state court. The Court disagreed that this captured the fault concept implicit in the clause, and explained:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

529 U.S. at 435. Thus, the "success" enjoinder simply means that the introductory clause looks at more than the mere fact that a record was not developed in state court. The "more" is diligence.

The district court followed this standard from *Williams* exactly. It focused on whether Schad's attempts to develop the record in state court were reasonable given what he knew, the information available at the time, and the four years plus funding that he requested and got. This applied the correct standard and adopted the right focus. In accord with *Williams*, the district court's conclusion was based on the fact that Schad had notice of the basis for his ineffectiveness claim from the time of sentencing, had nearly four years to develop

the record before the state post-conviction court, and pointed to no request of the state court for funding or anything else that was unreasonably denied.

Moreover, this conclusion is consistent with the outcome in *Williams* itself. There, the Court was concerned with three different claims; it found lack of diligence as to one (a *Brady* claim) but not the others (juror bias and prosecutorial misconduct claims). In the two claims on which the Court found diligence the trial record contained no evidence that would have put a reasonable attorney on notice of the misconduct, thus there was no basis for an investigation; also, counsel requested funding for an investigator, which the state court denied. By contrast, in the claim on which the Court found no diligence, the transcript put state habeas counsel on notice of an undisclosed report's existence and its potential materiality. The only indication that habeas counsel made some effort to investigate the *Brady* material was one letter; no further efforts were made. As the Court said, a diligent attorney would have done more. *Id.* at 439-40. Schad's situation is almost identical. The presentence report put post-conviction counsel on notice of the importance of Schad's family background; one phone call was made to Schad's mother; and no further efforts were made. As the district court said, a reasonable attorney provided with the time and funding to which post-conviction counsel had access would have done more. *Schad v. Schriro*, 454 F.Supp.2d at 956. Consequently, the efforts in Schad's case fall on the not-diligent side of the ledger, just as did the efforts in *Williams* on the *Brady* claim.

In sum, I think the district court got *Williams* precisely right. By the same token, I think the majority's emphasis on "success" misapprehends *Williams*. Also, I think the majority's focus on the strength of the newly developed evidence is itself improper.

Without explaining why, in the middle of its discussion about the "proper" standard for diligence, the majority posits

that the newly developed information "would have demonstrated at least some likelihood of altering the sentencing court's evaluation of the aggravating and mitigating factors present in the case." Maj. op. at 7892-93. However, considering the weight of evidence newly developed for federal court is nowhere grounded in § 2254(e)(2) or *Williams*.[14] It seems exactly backward to me. We are not supposed to start with the evidence newly developed for federal court, then determine whether that evidence has "some likelihood" of altering the sentencing court's evaluation, then decide that the petitioner made a threshold showing of reasonably attempting to develop it in state court. Rather, we are to start with diligence — asking whether the factual basis was developed in state court and if not, whether there is lack of diligence or some greater fault attributable to the petitioner — and never get to the weight of the newly developed evidence *unless* the petitioner bears no responsibility for failure to develop and present that evidence in state court. Put differently, evidence that could have been adduced in state post-conviction proceedings *if* the petitioner were diligent, should play no role in a finding that he *was* diligent. The effect otherwise is to write § 2254(e)(2)'s diligence requirement off the books.

Neither is there basis for requiring an evidentiary hearing *on diligence*. Schad never asked for one. The majority doesn't say that the district court had a *sua sponte* obligation to hold an evidentiary hearing, nor does it cite authority for any such thing, yet *it* orders the hearing *sua sponte*, for which, again, it points to no authority. More importantly, the record is what it is. Schad had the burden of showing he was diligent in his

---

[14]To the extent this discussion is intended as a bridge to the merits of Schad's ineffective assistance claim, it is way off the *Strickland* mark. The *Strickland* question is whether there is "a reasonable probability" that absent the errors asserted, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death, 466 U.S. at 695 — not, as the majority puts it, whether there is "at least some likelihood" of altering the sentencing court's evaluation of the aggravating and mitigating factors.

efforts. From the parties' submissions on this point, the district court could determine whether post-conviction counsel were on notice of the need to develop facts relating to Schad's family background and made reasonable efforts to do so in light of the information then available in the time, and with the resources, they had. The district court made that determination, and I think we should review it and affirm. The majority punts because it believes that there is too little information in the record to determine whether post-conviction counsels' efforts were reasonable. Maj. op. at 7892-93. However, lack of evidence of diligence in the state and federal record does not compel an evidentiary hearing, but rather, compels denial of Schad's request for an evidentiary hearing on the merits of his ineffective assistance claim. This is because he had the burden of showing he was diligent, didn't meet it, and § 2254(e)(2) accordingly bars an evidentiary hearing on the merits of his constitutional claim.

IV

Because I would affirm the district court's conclusion that Schad failed to exercise diligence in developing the factual basis of his ineffectiveness claim in state court, I have no need to reach the question whether he is entitled to an evidentiary hearing on that claim given that a hearing is statutorily barred by § 2254(e)(2). However, the majority does reach the issue, directing the district court to hold an evidentiary hearing on the merits of this claim if it finds in the other evidentiary hearing — on diligence — that Schad's efforts to develop the record in state court were reasonable. Maj. op. at 7892-93. I note that it does so without regard to the district court's extensive and reasoned holding in the alternative that, even considering the newly developed information, Schad was nevertheless not entitled to an evidentiary hearing on his ineffectiveness claim.[15] It also does so without regard to the state

---

[15]The district court concluded that trial counsel presented a strategically sound case in mitigation, and that the newly developed information is not of sufficient weight to create a reasonable probability that, if it had been presented, the trial court would have reached a different sentencing determination. 454 F.Supp.2d at 940-44 .

court's ruling that denied Schad's ineffectiveness claim on the merits. And it does so without reference to AEDPA, *Strick*-land, or the double deference owed to state court adjudications under *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009). *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (holding that a court considering a request for an evidentiary hearing "must take into account" the deferential standards of § 2254(d), and a hearing is not required "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief"). In my view, it is inappropriate to order an evidentiary hearing on an ineffective assistance claim without touching these bases.

## *Conclusion*

If a state prisoner can show that he indeed tried to develop facts in state post-conviction proceedings in support of an ineffective assistance of counsel claim, then he should be able to proceed in federal court on newly developed evidence because the principles of comity underlying § 2254(e)(2) will not be offended. But those principles will be offended if a state prisoner lets opportunity pass by without giving the state courts that convicted and sentenced him first crack at a claim that his constitutional rights were violated in the process.

Given that Schad had notice during post-conviction proceedings of the need to develop facts about his family background to support his claim of ineffective assistance of sentencing counsel, and the information available at the time, together with the opportunity afforded to develop that information in four years, with thirty-four extensions and with all the funding requested, I agree with the district court that Schad failed to show he was diligent in efforts to investigate and present those facts in state court.

The district court properly applied the governing standard from *Williams v. Taylor*: whether Schad made "a reasonable attempt, in light of the information available at the time, to

investigate and pursue" his constitutional claim. 529 U.S. at 435. Its analysis did not stop with the predicate question whether the factual basis was actually developed in state court. Rather, its focus was on the notice, information, time and resources available to Schad, as well as on the causes for delay. I would not remand for an evidentiary hearing on diligence that was neither requested nor required. As Schad did not develop the factual basis for his ineffective assistance claim in state court proceedings, no evidentiary hearing on the merits of that claim may be held. I would, therefore, affirm.